# Blaner v. IDEC Pharmaceuticals Corporation

C.P. of Allegheny County, no. GD00-21994.

*Kelli J. Kleeb,* for plaintiffs.
*Kerry A. Kearney,* for defendants Genentech Inc. and IDEC Pharmaceutical Corp.
*Marian Patchen Schleppy,* for defendant Lim.
*Charles C. Keller,* for defendant Monongahela Valley Hospital.
*Roy E. Leonard,* for defendant McKesson HBOC Inc.
*James R. Hartline,* for defendant Rao.
*Damon J. Faldowski,* for defendant Ruschak.

WETTICK JR., *J.,* March 28, 2002—The subject of this opinion and order of court is a motion filed by defendant-manufacturers seeking a ruling that a physician whom the manufacturers retained (Grant Anhalt M.D.) may furnish expert testimony in these proceedings. Dr. Anhalt is a nationally recognized expert in the field of PNP.[1] It is Dr. Anhalt's practice to respond, with-

_____

1. PNP is an abbreviation for paraneoplastic pemphigus which is an autoimmune disease affecting the skin.

out compensation, to inquiries of physicians located throughout the country treating patients who may be suffering from PNP. In the present case, a treating physician of plaintiff-husband, during the diagnosis and treatment of plaintiff, had two telephone conversations with Dr. Anhalt. It is the position of plaintiffs that Dr. Anhalt cannot offer expert testimony on behalf of the defendant-manufacturers in this litigation because of his involvement in plaintiff's treatment.

According to the allegations in plaintiffs' second amended complaint, plaintiff was being treated for chronic lymphocytic leukemia. On December 18, 1999, a physician (defendant Dr. Lim) administered the drug Rituxan. Plaintiff suffered an adverse and/or allergic reaction and developed a severe rash. On three additional occasions between November 24, 1999, and December 9, 1999, the same physician administered additional doses of Rituxan and plaintiff suffered worsening adverse and/or allergic reactions.

Between January and May 2000, plaintiff was seen by three physicians (defendants Miller, Ruschak, and Rao) for his skin rash. These physicians did not diagnose or treat plaintiff for PNP, the condition from which plaintiff was suffering. In July 2000, the condition was properly diagnosed by another doctor.

In this lawsuit, plaintiffs raise claims based on negligent medical care against treating physicians and a hospital, and claims against the manufacturing defendants (Genentech and IDEC Pharmaceuticals) based on allegations that Rituxan caused the PNP.[2] In this lawsuit,

---

2. Genentech manufactures Rituxan.

plaintiffs have not sued the physician who contacted Dr. Anhalt.

It is the position of Genentech and IDEC Pharmaceuticals that Rituxan did not cause plaintiff's PNP. These defendants wish to offer Dr. Anhalt as an expert in support of this position. Dr. Anhalt will testify that plaintiff's exposure to Rituxan is not the cause of the PNP because the development of an autoimmune disease is a slow process.

At his October 9, 2001 deposition, Dr. Anhalt offered the following testimony: He is a physician in the Dermatology Department of Johns Hopkins University, School of Medicine. He was the first author on the publication that initially identified PNP as a unique syndrome. He has authored between 50 and 75 articles relating to PNP. He has accumulated data on more than 150 cases over the last 11 years. He has the most experience in the world with this disease.

He is constantly contacted by physicians seeking assistance with patients who may have PNP. In the fall of 2000, he talked, on one or two occasions, to a treating physician from Pittsburgh with whom he had no relationship (Dr. Earle) about a patient with PNP. He advised the treating physician that the disease sounded like PNP and that the physician should send serum from the patient to Dr. Anhalt's lab so the treating physician could confirm that it was PNP.[3]

The discussion between Dr. Anhalt and the Pittsburgh physician included treatment. Dr. Anhalt suggested the

---

3. Johns Hopkins is the only place where a serum test may be done for diagnostic purposes. The serum test confirmed that plaintiff has PNP.

current regimen that was used at that time, which was Prednisone, Cyclosporine, and Cytoxan/Oxytocin. (T. 18, 96.)

In late January 2001, Dr. Anhalt was hired by Genentech as a consultant. On January 29, 2001, Dr. Anhalt entered into a written agreement with Genentech to review all serious, skin-related adverse events suffered by patients taking Rituxan. On February 16, 2001, he initially met with Genentech officials at a site visit. He reviewed 20 cases identified by number; these were cases in which there were reports of significant skin reactions. The 20 cases included plaintiff's case.

For these 20 cases, Dr. Anhalt was not provided with a name or other identifying data. Dr. Anhalt issued a report dated March 8, 2001, in which he concluded that patient MCN095644 suffered from PNP and that his condition was not drug-related. Plaintiff is patient MCN095644. Dr. Anhalt's report states that PNP occurs "as a slowly evolving complex of symptoms" (D00102); that PNP occurs primarily in the presence of a known neoplasm (tumor) (D00101); and that PNP "is an inherent risk due to the underlying malignancy, not to any therapy applied" (D00104).

In his deposition, Dr. Anhalt stated that the common denominator in the 150 PNP cases he has considered in the past 11 years is that a malignancy has been present for a long time before the patient develops PNP. It is not plausible that a short exposure to a drug could induce an autoimmune disease. Autoimmunity is not something that happens with a short-term exposure to anything. (T. 27-29.) This testimony, that Rituxan could not have been a triggering mechanism for plaintiff's PNP because of

the short time between the exposure and the manifestation of the PNP, is the subject of defendant-manufacturers' motion.

While there are no Pennsylvania appellate court cases addressing the issue of whether a physician who voluntarily furnishes advice to a treating physician regarding the diagnosis and treatment of the treating physician's patient should also be characterized as a treating physician, cases in other jurisdictions hold that there is no physician-patient relationship. In these other jurisdictions, the issue arises primarily in the medical malpractice context. In almost all cases, the courts dismiss medical malpractice actions against the physician who rendered assistance to the treating physician on the ground that the law does not impose a duty of care where a physician has not assumed responsibility for the care of the patient. These cases are relevant to the present motion because a court that is not imposing a duty of care would not impose duties of confidentiality or loyalty.[4]

Plaintiffs rely on Pa.R.C.P. 4003.6, governing discovery of treating physicians, and case law construing this rule in support of their position that Dr. Anhalt cannot testify as an expert for any parties whom plaintiffs have sued.

Rule 4003.6 reads as follows:

"Rule 4003.6. Discovery of treating physician

---

4. Under 42 Pa.C.S. §5929, a physician may not disclose any information "which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity."

"Information may be obtained from the treating physician of a party only upon written consent of that party or through a method of discovery authorized by this chapter. This rule shall not prevent an attorney from obtaining information from

"(1) the attorney's client,

"(2) an employee of the attorney's client, or

"(3) an ostensible employee of the attorney's client."

In *Marek v. Ketyer,* 733 A.2d 1268 (Pa. Super. 1999), the court ruled that a treating physician for the plaintiff may not testify as an expert for a defendant because of the privacy interest underlying the physician-patient relationship and the physician's duty of loyalty to the patient.

Defendants are not contesting the principle that the treating physician for a plaintiff should not be permitted to testify as a defense expert without the plaintiff's consent.[5] It is defendants' position that Dr. Anhalt should not be characterized as a treating physician. I agree.

Dr. Anhalt never met plaintiff; he was not part of the treatment team; he had no relationship with plaintiff's treatment team; he did not review the plaintiff's medical records during the time he was discussing plaintiff's case with plaintiff's treating physician; he did not charge for making his expertise available; and he did not make any decisions regarding plaintiff's treatment. There was no

---

5. A defendant may call a plaintiff's treating physician as a fact witness provided that there has been no ex parte communication between the defendant or the defendant's counsel and the treating physician. In the present case, defendants' representatives have had ex parte communications with Dr. Anhalt and defendants seek to call Dr. Anhalt as an expert witness.

confidential relationship between plaintiff and Dr. Anhalt because of the absence of a physician-patient relationship.

Also, Dr. Anhalt did not owe plaintiff any duty of loyalty. He never assumed any responsibility to protect plaintiff's interests vis-à-vis the interests of other persons. He was simply a volunteer making his expertise available to a physician in connection with that physician's treatment of the patient.

In *Irvin v. Smith*, 31 P.3d 934 (Kan. 2001), the treating physician made a telephone call to obtain "a neurological consult" from Dr. Gilmartin, a child neurologist. This was a lengthy telephone call in which the physicians engaged in a detailed conversation about the condition, care, and treatment of the child. The treating physician telephoned Dr. Gilmartin because of his experience and expertise as a pediatric neurologist. Dr. Gilmartin testified that as a result of the conversation he had a complete picture of the child's presentation and had jointly developed, with the treating physician, a plan for evaluation of the child. In addition, he agreed to see the child the next day, to carry out a formal consultation, and to assist in conducting a diagnostic test.

Before Dr. Gilmartin assumed responsibility for the patient, the patient's condition deteriorated. The child's parents brought a malpractice action against several physicians, including Dr. Gilmartin, based on allegations that the child's symptoms had indicated an impeding shunt malfunction requiring immediate action.

The Supreme Court of Kansas upheld the ruling of the trial court granting Dr. Gilmartin's motion for summary judgment on the ground that he did not owe a duty to the

child because there was no physician-patient relationship. The court characterized the conversation between Dr. Gilmartin and the other physician as a type of telephone conversation that "takes place on a frequent basis in the medical profession and is vital to the treatment of patients." *Id.* at 943. The court, citing case law of other jurisdictions, stated that:

"Courts have used great caution when responding to requests that they recognize legal duties within this medically important but legally ambiguous world of the curbside consultation. Indeed, the published decisions are unanimous in agreeing that extension of the physician-patient relationship to include this type of informal consultation would be contrary to public policy. 'Imposition of liability under these circumstances would not be prophylactic but instead counter-productive by stifling efforts and improving medical knowledge.' " *Id.* (citations omitted)

In *Schrader v. Kohout,* 522 S.E.2d 19 (Ga. Ct. App. 1999), a patient with a history of psychological problems brought a malpractice action against a psychologist with whom the patient's treating psychologist had consulted. The trial court denied the consulting psychologist's motion for summary judgment. The court of appeals reversed.

In that case, the plaintiff began treatment with the treating psychologist in 1990. A short time later, the treating psychologist began consulting with the defendant psychologist concerning the patient's care because of the defendant's expertise in dissociative disorders. The consultations began in May 1991 and ended in December 1995. The defendant met with the treating psychologist

individually during the first four consultations and the remainder were group consultations that included approximately five other psychotherapists. Treatment options were discussed extensively during the sessions which occurred bimonthly and lasted two hours. The treating psychologist paid a fee to the defendant for the consultation. However, the fee was paid personally by the treating psychologist and there was no evidence showing that the patient was charged for the defendant's services.

The court ruled that this was not a physician-patient relationship because the defendant never assumed any control over the care of the patient.

In *Reynolds v. Decatur Memorial Hospital,* 660 N.E.2d 235 (Ill. App. Ct. 1996), the minor plaintiff was brought to the emergency room and a treating pediatrician telephoned Dr. Fulbright at his home. She described the child's conditions. At the end of the conversation, Dr. Fulbright suggested a spinal tap. Approximately an hour later, the pediatrician performed the spinal tap. The patient and his parents sued the hospital, other physicians, and Dr. Fulbright based on an incorrect diagnosis. The plaintiffs' expert opined that Dr. Fulbright failed to meet the generally accepted standards of practice in the medical community by his failure to examine the child and the records before making a recommendation and by failing to follow through after being consulted.

The trial court granted summary judgment in favor of Dr. Fulbright. The appellate court affirmed. It stated that a physician-patient relationship which imposes obligations on the physician can only arise where the physician assumes responsibility for the patient. In this case,

Dr. Fulbright did nothing other than answer an inquiry from a colleague. He was not contacted again; he did not charge a fee; and he never directed the actions of the pediatrician or other persons treating the child. The court, citing the case law of five other jurisdictions, stated that: "A doctor who gives an informal opinion at the request of a treating physician does not owe a duty of care to the patient whose case was discussed." *Id.* at 239. (citations omitted)

The court followed this case law because it concluded that it would be contrary to the public interest to impose obligations on physicians who voluntarily give opinions to the treating physician who continues to assume responsibility for the patient's care:

"Plaintiffs suggest that what needs to be done is to find a physician-patient relationship to result from every such conversation. The consequence of such a rule would be significant. It would have a chilling effect upon practice of medicine. It would stifle communication, education and professional association, all to the detriment of the patient. The likely effect in adopting plaintiff's argument also would be that such informal conferences would no longer occur. To reiterate, this would inhibit the exchange of information and expertise among physicians and would not benefit the medical profession or persons seeking treatment." *Id.* at 240. (citations omitted)

In *Hill v. Kokosky,* 463 N.W.2d 265 (Mich. Ct. App. 1990), the trial court entered summary judgment in favor of two physicians with whom the patient's obstetrician had discussed the case. Neither physician had met with the patient, examined her, or reviewed her chart.

They gave opinions based on the case history that the treating physician related to them.

The court of appeals affirmed the ruling of the trial court. The court stated that while this was an issue of first impression in this state, other jurisdictions that had considered this question concluded that in the absence of a referral, formal consultation or some other contractual relationship, no physician-patient relationship arises. In this case, the plaintiff had neither employed the defendants nor sought the defendants' medical advice for treatment. The medical opinions were furnished to the treating physician as a colleague and not indirectly to the plaintiff as a patient. The opinions of the defendants did not constitute a prescribed course of treatment but were recommendations to be accepted or rejected by the treating physician as he saw fit. "We do not believe that this limited and remote connection to the case can be equated with 'treatment,' however, any more than the author of a medical treatise or article which Dr. Hole might have consulted could be considered to have 'treated' plaintiffs." *Id.* at 267.

The court agreed with the conclusion reached in other cases that:

"The extension of a potential malpractice liability to doctors with whom a treating physician has merely conferred, without more, would unacceptably inhibit the exchange of information and expertise amongst physicians. This would benefit neither those seeking medical attention nor the medical profession. Under these circumstances, we decline to apply the duty of care which plaintiffs urge." *Id.* at 268.

The case law distinguishes between the consulted physician who has no relationship with the consulting physician and the consulted physician who has a contractual relationship with the consulting physician or the hospital employing the consulting physician.

Consider *Corbet v. McKinney*, 980 S.W.2d 166 (Mo. Ct. App. 1998), where the court ruled that a specialist whom a treating physician contacted cannot be sued for medical malpractice:

"In contrast, where the consulted physician merely undertakes to advise the patient's treating physician, has no explicit contractual obligation to the patient, treating physician, or treating hospital to provide care, and does not take actions which indicate knowing consent to treat a patient who has sought that treatment, such as by examining, diagnosing, treating, prescribing treatment for, or charging the patient, no relationship and no duty of care arises. Accordingly, courts which have been asked to determine the existence of a physician-patient relationship in factual situations similar to the one before us have found none." *Id.* at 170.

Compare *McKinney v. Schlatter*, 692 N.E.2d 1045 (Ohio Ct. App. 1997), where the court ruled that a physician-patient relationship existed between the patient and on-call cardiologist under the following circumstances:

"We therefore hold, and in doing so are mindful that we are elaborating in the field of medical malpractice, that a physician-patient relationship can exist by implication between an emergency room patient and an on-call physician who is consulted by the patient's physician but who has never met, spoken with, or consulted

the patient when the on-call physician (1) participates in the diagnosis of the patient's condition, (2) participates in or prescribes a course of treatment for the patient, and (3) owes a duty to the hospital, staff or patient for whose benefit he is on call. Once an on-call physician who has a duty to the hospital, its staff, or patients is contacted for the benefit of an emergency room patient, and a discussion takes place between the patient's physician and the on-call physician regarding the patient's symptoms, a possible diagnosis and course of treatment, a physician-patient relationship exists between the patient and the on-call physician." *Id.* at 1050.

Plaintiffs contend that this case is governed by *Marek v. Ketyer, supra.* In *Marek,* the plaintiff sought a new trial on the ground that a treating physician (Dr. Beerman) had communicated ex parte with defense counsel and testified as a defense expert as to liability without the plaintiff's consent in violation of Rule 4003.6. The issue that the court addressed was whether Dr. Beerman was a treating physician.

The minor plaintiff had been seen by Dr. Ketyer who referred the child to Children's Hospital for testing and treatment. An echocardiogram was taken and reviewed by Dr. Beerman. He was a member of the cardiology team that was treating the child and he communicated his impressions about the results of the test and the information it provided to other members of the team. The malpractice lawsuit did not question the quality of the services that Dr. Beerman rendered.

The defendants contend that Dr. Beerman was no more than an impersonal reader of the echocardiogram who should not be characterized as a "treating physician"

under Rule 4003.6 because he never spoke with the parents nor recommended any medication or therapy. The Superior Court disagreed; it ruled that he must be considered a treating physician because he reviewed the infant's echocardiogram and communicated with members of the cardiology team about its results in connection with the child's care. He billed the plaintiffs for his services and was paid. He rendered his services in the treatment of a child in an effort to see to her recovery.

*Marek* is readily distinguishable from the present case. In the present case, Dr. Anhalt was not a member of the team that was treating the plaintiff and he did not bill for his services. He simply provided advice and assistance to the treating physician which that physician could follow or not. Dr. Anhalt assumed no responsibility for the treatment of plaintiff.

## CONCLUSION

The record includes a memo to Dr. Anhalt from the Pittsburgh dermatologist who initially diagnosed plaintiff with PNP thanking Dr. Anhalt for his assistance:

"We 'in the hinterlands' really appreciate having phone access to someone not only so knowledgeable about a particular subject, but willing to share his expertise in the interest of patient care. Thank you *very* much. (GA00092)."

Courts should not make rulings that will discourage this practice. When I consider the factors set forth in Pa.R.C.P. 127, I conclude that Rule 4003.6 was not intended to cover the situation in which a physician is voluntarily giving advice to a treating physician for the pur-

144

pose of assisting the treating physician in making decisions regarding the diagnosis and treatment of a patient.

## ORDER

On March 28, 2002, it is ordered that Rule 4003.6 does not preclude defendants from using Dr. Anhalt as an expert witness in these proceedings.